## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COVERALL NORTH AMERICA, INC.,

Petitioner, 05 - 11872 RGS

vs.

Civil Action No. RECEIPT # 66899
AMOUNT $ 250

CARLOS FURTADO and AMILTON
DESOUZA,

SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM

Respondents.

MCF ISSUED
BY DPTY. CLK.
DATE 9/15/05

### PETITION TO COMPEL ARBITRATION

Petitioner, Coverall North America, Inc. ("Coverall"), by its attorneys, as and for its

Petition to Compel Arbitration pursuant to Section 4 of the Federal Arbitration Act, 9 U.S.C. § 1,

*et seq.*, states as follows:

### Nature Of The Action

MAGISTRATE JUDGE ____

1.      This is an action brought pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C.

§ 4, to compel arbitration. Pursuant to the written Franchise Agreement entered into by and

between Petitioner Coverall and Respondents, the parties agreed to submit all disputes arising

out of or relating to the Franchise Agreement, its validity or the relationship of the parties, to

arbitration to be conducted in Massachusetts before the American Arbitration Association.

2.      After a dispute arose between the parties, and after the parties' efforts to mediate

those disputes proved unsuccessful, Coverall commenced arbitration proceedings against the

Respondents. Shortly after the arbitration proceedings were commenced, Respondents' counsel

advised the American Arbitration Association that Respondents disputed "that there is a valid

arbitration agreement between them and Coverall."

3.    By this action, Coverall seeks to compel Respondents to arbitrate the dispute set forth in Coverall's Demand for Arbitration, as well any counterclaims Respondents intend to assert against Coverall, as provided for in the parties' written arbitration agreement.

## The Parties

4.    Petitioner Coverall is a Delaware corporation with its principal place of business in Boca Raton, Florida. Coverall is engaged in the business of granting franchises to qualified persons to operate commercial janitorial cleaning businesses, and to use Coverall's trade names and marks, as well as Coverall's operating system (the "Coverall® System"), in connection therewith. Coverall franchisees are provided with, among other things, training, equipment, billing and collection services, and a quality control program. Coverall also provides its franchisees customer accounts to clean. Under the Coverall System, Coverall enters into contracts with customers for cleaning services, and delegates the performance of the services under the contracts to its franchisees.

5.    Respondents Amilton DeSouza and Carlos Furtado are franchisees of Coverall. On information and belief, the Respondents are residents and citizens of the Commonwealth of Massachusetts.

## Jurisdiction and Venue

6.    This action arises under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*

7.    This Court has original subject matter jurisdiction of this action in that, save for the parties' agreement to arbitrate, this Court would have jurisdiction under 28 U.S.C. § 1332 of a civil action arising out of the controversy between the parties, in that the parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

- 2 -

8.     Venue is proper in this Court under 9 U.S.C. § 4, in that this is the United States District Court having jurisdiction over the contractually specified site of arbitration, and 28 U.S.C. § 1391, in that a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## The Franchise Agreements And The Parties' Arbitration Agreements

9.     On or about December 2, 2003, Amilton DeSouza and Carlos Furtado entered into a written Janitorial Franchise Agreement with Coverall d/b/a Coverall of Boston pursuant to which Coverall granted Desouza and Furtado a franchise to operate a commercial janitorial business in the Boston, Massachusetts area.

10.     Under Section 21 of the Franchise Agreement, the parties explicitly agreed that they would submit all disputes arising out of or relating to the Agreement, the validity of the Agreement or the parties' relationship to arbitration before the American Arbitration Association. Section 21 of the Franchise Agreement provides, in pertinent part, that:

[A]ll controversies, disputes, or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising our of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual . . . shall be submitted promptly for arbitration.

Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

The arbitration shall take place in the Area in which the Franchisee conducts its business, and shall be administered by the office of the American Arbitration Association or as mutually agreed by the parties.

* * *

- 3 -

~BOST1:391131.v1

Franchisee and Coverall agree that arbitration shall be conducted on an individual, not class wide basis.

11.    Section 21.C of the Franchise Agreement provides that "Should either Party incur attorney's fees in order to enforce the terms and conductions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees."

12.    The parties' written arbitration agreement is valid, has not been revoked and is enforceable upon such grounds as exist at law or in equity.

13.    The parties' written arbitration agreement appears in a contract evidencing a transaction involving interstate commerce.

14.    The making of the arbitration agreement is not at issue.  Nor is any failure to comply therewith.

15.    Coverall is not in default in proceeding with such arbitration by failing, neglecting, or refusing to arbitrate under the parties' written agreement to arbitrate.

## Respondents' Refusal To Arbitrate Their Disputes

16.    In or around early 2005, a dispute arose between the parties.  The dispute was subsequently submitted to non-binding mediation in accordance with the provisions of the parties' Franchise Agreement.  The parties were not able to resolve their disputes.

17.    On August 30, 2005, Coverall filed an arbitration proceeding against Respondents seeking to resolve its various claims.  The arbitration is captioned as *Coverall North America, Inc. v. Amilton DeSouza and Carlos Furtado*, Case No. 11-114-01907-05.  Coverall's Demand for Arbitration seeks, among other things, damages for Respondents' breaches of the Franchise

- 4 -

Agreement, declaratory relief and attorneys' fees. (A true and correct copy of the Demand for Arbitration is attached hereto as Exhibit A.)

18. In a September 14, 2005 letter to the American Arbitration Association, Respondents' counsel stated that Respondents "dispute that there is a valid arbitration agreement between them and Coverall." The presumed basis for this belief is Respondents' contention that Respondents "should have been classified as employees of Coverall, rather than independent contractors" – an assertion that Respondents' counsel asserted would be part of a class action lawsuit to be filed against Coverall. (A copy of this letter is attached hereto as Exhibit B.)

19. Respondents' claim that they should have been classified as employees of Coverall rather than independent contractors arises out of or relates to "the relationship of the parties" and the Franchise Agreement, and therefore falls within the scope of the parties' written arbitration agreement.

## Specific Relief To Compel Arbitration

20. Respondents' assertion that they are not bound to arbitrate their dispute with Coverall constitutes a failure, neglect and/or refusal on their part to arbitrate in accordance with the parties' written arbitration agreement.

21. Petitioner has no adequate remedy at law.

22. No previous Petition has been made for the relief requested herein.

- 5 -

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner Coverall North America, Inc. respectfully prays for the following relief against Respondents:

A.     An order pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, made in the manner provided by law for the making and hearing of motions, compelling arbitration in accordance with the terms of the parties' arbitration agreement;

B.     An award of reasonable attorneys' fees, expenses and costs incurred by Coverall in this action; and

C.     Such other relief as the Court deems just and proper.

**COVERALL NORTH AMERICA, INC.,**

By its attorneys,

Michael D. Vhay (BBO #566444)
Traci S. Feit (BBO# 660688)
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2600
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated:  September 15, 2005

- 6 -

## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
## BOSTON, MASSACHUSETTS

| |
|---|
| **COVERALL NORTH AMERICA, INC.,** |
| Claimant, |
| v. |
| **CARLOS NUNES FURTADO and AMILTON M. DESOUZA,** |
| Respondents. |

## DEMAND FOR ARBITRATION

Claimant, Coverall North America, Inc. ("Coverall"), by its attorneys, as and for its

Demand for Arbitration against Respondents, Carlos Nunes Furtado and Amilton M. DeSouza

(the "Respondents"), states as follows:

### Nature of the Action

1.    By this action, Coverall seeks to recover the balance due on a note payable to

Coverall, and a declaration that the Respondents are not "employees" of Coverall. Coverall also

seeks the costs and fees incurred in connection with this action, as provided for in the parties'

arbitration agreement.

### Parties

2.    Coverall is a Delaware corporation with its principal place of business in Boca

Raton, Florida. Coverall is a sales and marketing company engaged in the business of selling

franchises to operate commercial janitorial cleaning businesses. Coverall franchisees have the

right to use Coverall's trade names, marks, and operating system (the "Coverall® System") in

connection with their franchises. Coverall trains its franchisees in all aspects of owning their

own business, including how to manage cash flow, how to hire and fire employees, and how to

grow their business. Coverall also provides its franchisees with training in state of the art cleaning methodologies. To provide franchisees with a firm footing in their new businesses and generate immediate cash flow, Coverall provides its franchisees with an initial customer base. Thereafter, franchisees may procure customers on their own or purchase additional business from Coverall.

3.      Respondents Furtado and DeSouza are residents of Massachusetts. They are franchisees of Coverall.

**The Parties' Written Franchise Agreement**

4.      On or about December 2, 2003, Respondents entered into a written Janitorial Franchise Agreement (the "Franchise Agreement") with Coverall d/b/a Coverall of Boston pursuant to which Coverall granted Respondents a franchise to operate a commercial janitorial business in the Boston, Massachusetts area. (A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A.)

5.      Respondents paid $11,500 for the franchise they acquired, $5,000 of which was paid upon execution of the Franchise Agreement. The $6,500 balance of the franchise fee was financed pursuant to a December 2, 2003 promissory note (the "Note") which Respondents executed in favor of Coverall. (A true and correct copy of the Note is attached hereto as Exhibit B.) Respondents also signed a personal guaranty of the Note. (A true and correct copy of the Guaranty is attached hereto as Exhibit C.)

6.      Respondents have made no payments under the Note since September 2004.

7.      Respondents have a balance due under the Note in the amount of $3,548.99.

8.      Furthermore, despite his contractual acknowledgment that he is an independent contractors and not an employee, and despite the nature of the parties' relationship, Furtado has

2

~BOST1:387126.v4

asserted that he is an employee of Coverall and, as a result, is entitled to, among other things (i) hourly wages; (ii) the statutory minimum wage; (iii) a time-and-a half rate of pay for any hours worked in excess of 40 hours/week, (iv) payment for travel time, (v) workers' compensation insurance, and (vi) unemployment benefits. Coverall contends that Furtado is a franchisee, and not an employee, and seeks a declaration to that effect.

9.    Accordingly, there is an actual controversy among the parties in this case and a declaration of the rights of the parties would terminate the controversy or some part thereof.

3

~BOST1:387126.v4

## The Relief Sought

10.    Coverall seeks an award of the balance due on the Note. Coverall also seeks a

declaration that it owes no duties to Respondents as an employer under Massachusetts law.

**WHEREFORE,** Coverall respectfully requests that the Arbitrator issue an award:

A.    Awarding Coverall the balance due on the Note;

B.    Declaring that Respondents are franchisees, and not employees, of Coverall;

C.    Awarding Coverall the costs and fees incurred in this arbitration, as provided for

in the parties' Franchise Agreement; and

D.    Such other and further relief as the Arbitrator deems just and proper.

**COVERALL NORTH AMERICA, INC.,**

By:  _____
One of its Attorneys

Michael D. Vhay (BBO# 566444)
**DLA Piper Rudnick Gray Cary US LLP**
One International Place, 21st Floor
Boston, MA 02110
(617) 406-6000

Norman M. Leon
**DLA Piper Rudnick Gray Cary US LLP**
203 North LaSalle Street, Suite 1900
Chicago, IL 60601
(312) 368-2192

Dated: August 22, 2005

4

FRANCHISE # *P608*

# COVERALL NORTH AMERICA, INC. dba COVERALL OF BOSTON

## 105 Central Street, Suite 1100, Stoneham, Massachusetts 02180

### JANITORIAL FRANCHISE AGREEMENT

THIS AGREEMENT (hereinafter referred to as "Agreement") is entered into by and between Coverall North America, Inc., dba Coverall of BOSTON                , a corporation organized and existing under the laws of the State of Delaware, hereinafter referred to as "Coverall," and *CARLos Furtado / Amilton DeSouza* hereinafter referred to (singularly or collectively) as "Franchisee" for the purposes of allowing Franchisee to operate a business as a Franchisee of Coverall. Franchisee is doing business as a:

[ ] Sole Proprietorship    [✓] Partnership    [ ] Corporation, incorporated under the laws of

Effective Date of Agreement: **The effective date of this Agreement will be the date it is signed by the Regional Director and Franchisee; provided, however, that if the Agreement is not signed by a corporate officer as provided on the last page of this Agreement, then the Agreement will not be effective.**

Initial Franchise Fee: *11 500*

Down Payment: *5000*

Amount Financed by Coverall: *6500*
(with interest at 12% per annum)

Term of Franchise ("Initial Term"): 20 years
**Franchise Package**

Financing Period: *24* months
(equal consecutive monthly installments of principal & interest)

Package Purchased: **P-** *2000*

Amount of Each Monthly Installment: *305.98*

Monthly $ Volume of Initial Business: $ *2000*
Initial Business Offering Period: *60* days
(in which Initial Business shall be offered after Franchisee's completion of initial training - calculated per Paragraph 4A hereof)

The first installment of principal and interest shall be paid on the last day of *Feb , 04*

**REPRESENTATIONS** Franchisee makes the following representations: If Franchisee is a sole proprietor, partnership, or corporation, there is set forth below, as the case may be, the name, address and other information of the sole proprietor, of each partner of the partnership, or of each shareholder in the corporation:

Franchisee Name: *CARLos Furtado*
Address: *249 Chatham St Apt1 Lynn, MA01902*
Phone: *781- 592-8315*    Social Security Number: *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*    Percentage Interest*:

Franchisee Name: *Amilton DeSouza*
Address: *352 Chelsea St Apt3 E-Boston MA 02128*
Phone: *617-567-5033*    Social Security Number:    Percentage Interest*:

Franchisee Name:
Address:
Phone:    Social Security Number:    Percentage Interest*:

*As to a partnership, this shall indicate the percent owned in the capital and/or profits of the partnership. As to a corporation, this shall indicate the percent owned of the outstanding stock of the corporation.

Federal I.D. # of Franchisee if a partnership or corporation:

Address for mailing notices to Franchisee:

Franchisee acknowledges receipt from Coverall of a Franchise Disclosure Document which describes the Franchise to be operated pursuant to the terms of this Agreement. Franchisee acknowledges receipt of a completed copy of this Agreement at least five (5) business days prior to its execution.

*Carlos chun Furtado*  12-02-03
**Franchisee's Signature**    **Date**

*Amilton M. de Souza*  12.02 03
**Franchisee's Signature**    **Date**

© 2003 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 1 of 24

**Coverall – 14**

## RECITALS:

A. Coverall is the owner of certain trademarks and service marks, including the marks "Coverall®" and "Coverall Cleaning Concepts®;" and

B. Coverall, as the result of the expenditure of time, skill, effort, and money, has developed and owns a distinctive system ("the System") relating to the establishment and operation of janitorial cleaning service businesses. The distinguishing characteristics of the System include, without limitation, methods, procedures, standards, and equipment for janitorial cleaning and business services; procedures for quality control and customer assistance; marketing concepts; bidding, contracting, and billing procedures; training, assistance, advertising, and promotional programs; all of which may be changed, improved, and further developed by Coverall from time to time; and

C. Coverall, as part of its business operations, licenses the use of its name and service mark to Coverall franchised professional cleaning and maintenance businesses which provide cleaning, maintenance and janitorial services to commercial cleaning customers, and provides Coverall's franchisees with the various components of the System for use in their Coverall businesses; and

D. Coverall, as part of its business operations, obtains customer accounts, which are contracts between Coverall and cleaning customers, under which Coverall delegates the performance of services to its franchisees; and

E. Franchisee desires to utilize the trade name, service mark, reputation, techniques, and the System of Coverall, as a Coverall franchisee, in operating a commercial janitorial cleaning service business.

## TERMS OF AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual promises and covenants contained in this Agreement, the parties agree as follows:

1. USE OF TRADE NAME, SERVICE MARKS, AND CONFIDENTIAL AND PROPRIETARY INFORMATION.

A. The License. Coverall grants to Franchisee a non-exclusive license, upon the terms and conditions contained in this Agreement, to use and display "Coverall®," "Coverall Cleaning Concepts®," "Coverall and Design®," "The Art And Science Of Cleaning®," "Making Your World A Cleaner Place®," "When It Has to be Absolutely Clean®," "Customers for Life®," and/or such other names and designs as Coverall may from time to time designate, as Franchisee's trademarks, service marks, trade names, logos, labels and designs (the "Marks"), but only in connection with the rendering of Franchisee's services in the commercial janitorial service business in the territory as described in Paragraph 3, and only on those items and in the form approved by Coverall. Nothing contained in this Agreement shall be construed to permit the use by Franchisee of the Marks in any medium, in any other manner or for any other purpose except as expressly provided. Coverall expressly reserves all rights with respect to the Marks, as well as to any trade secrets, processes, methods of operation, and goodwill granted to Franchisee. Accordingly, Coverall reserves the sole right to institute administrative proceedings and/or litigation regarding the Marks. The Franchisee shall not have any right, title, or interest in or to the Marks, trade secrets, processes, methods of operation, or goodwill of Coverall. Coverall further reserves the right to modify, discontinue and/or change the Marks, name, and/or design. In the event of modifications, changes, or discontinuations, Franchisee will upon receipt of written notice, and at its sole expense, promptly discontinue use of the discontinued name and/or Marks and adopt and promptly begin use of the new or modified name and/or Marks, and promptly implement the modifications and/or changes to the System. Franchisee expressly and specifically waives any claims, demands, or damages arising from or related to the loss of the Marks (or any variation) and/or the loss of association with or identification with the Mark "Coverall®" arising out of Coverall's exercise of the above reservation. Franchisee agrees to use only the Marks designated by Coverall and to use the Marks only in the manner approved by Coverall. Franchisee agrees not to use the Marks or any name or design confusingly similar to the Marks in Franchisee's corporate or other legal or business name. Franchisee must promptly tell Coverall if Franchisee learns about unauthorized use of Coverall's confidential, proprietary, and copyrighted information.

B. Termination of License. Upon the expiration or termination of this Agreement and the license for any reason, Franchisee agrees that it will, immediately discontinue the use of the Marks, deliver and surrender to

(i) If Franchisee refuses to accept any customer account(s) timely offered to fulfill the Initial Business, Coverall shall be deemed to have fulfilled its obligations to offer customer accounts during the Initial Business Offering Period.

(ii) However, Coverall shall remain obligated to offer, within a reasonable period of time after the expiration of the Initial Business Offering Period (identified on Page 1), the amount of gross monthly dollar volume refused by Franchisee; provided, however, that if Franchisee unreasonably refuses to accept customer accounts offered within a reasonable time after the Initial Business Offering Period has expired, Coverall shall be deemed to have fulfilled its obligation to provide Initial Business for the dollar volume of the customer account(s) which has been unreasonably refused by Franchisee.

(iii) If Franchisee chooses to discontinue servicing a customer account(s) accepted as part of the Initial Business, Coverall shall be deemed to have fulfilled its obligation to provide Initial Business for the dollar volume of the abandoned customers account(s).

The time within which Coverall shall offer the Initial Business to Franchisee (the "Initial Business Offering Period," identified on Page 1), is calculated from the date of completion of Initial Training as follows:

(1)     For Initial Business packages up to and including $3,000 gross dollar volume per month (all packages up to and including the P-3,000), one hundred twenty (120) days;

(2)     For Initial Business packages exceeding $3,000 gross volume per month (all packages larger than the P-3000), one hundred twenty (120) days plus an additional thirty (30) days for each $1,000 (or portion thereof) in gross dollar volume per month over the initial $3,000.

Example:
Franchise Package:     $5,000
Initial Business Offering Period: 180 days from completion of training
Accordingly, if Franchisee purchases a P-5000 and completes Initial Training on March 1, all $5,000 in Initial Business must be offered on or before August 28 of that same year.

B.     Guarantee

Coverall provides a limited guarantee for the Franchisee's Initial Business. The guarantee applies only to customers lost through no fault of the Franchisee. Customers lost because of faulty workmanship, Franchisee's lack of trustworthiness or any other defaults by Franchisee are not guaranteed. Franchisee may qualify for either a twelve (12) month guarantee or a six (6) month guarantee, which begins on the date that Franchisee begins servicing the customer. If Franchisee qualifies for either guarantee, Coverall will replace the dollar volume of the lost customer, with one or more customers of equal dollar volume. If the replacement customer(s) has a dollar volume in excess of that lost by Franchisee, Franchisee may have to pay Coverall for the excess dollar volume.

This Initial Business guarantee is provided only under the following conditions:

(1) To qualify for the 12 month guarantee, for each month from the date Franchisee begins servicing an account, Franchisee must perform an inspection with the customer, and submit the Inspection Report, which must be signed by the customer, to Coverall no later than the 5th day following the inspection. *Franchisee must do all 12 inspections to qualify for the 12 month guarantee.*

(2) If Franchisee chooses not to perform the inspections, or if Franchisee fails to do an inspection in any month or fails to timely submit a properly completed Inspection Report, then Franchisee only qualifies for a 6 month guarantee.

(3) Dollar volume replaced by Coverall under either guarantee is only guaranteed to the extent that there is time remaining under the original guarantee. For example, if Franchisee loses an account after three months and Franchisee qualifies for the 6 month guarantee, the replacement account is only guaranteed for the time remaining, 3 months.

Initial     Initial

A.M.S

designee of Franchisee to attend the Initial Training instead of the person(s) signing this Agreement. Up to two employees of Franchisee, approved by Coverall, may also attend the Initial Training. There shall be no charge for the Initial Training.

    (2)   Additional Training. Any training to be provided to Franchisee by Coverall after the Initial Training, is "Additional Training." Additional Training shall include, but shall not be limited to, any training course offered in the Initial Training, or any other training provided by Coverall to Franchisee and/or its approved employee(s). Additional Training shall also include courses introducing new methods developed after the Initial Training. Franchisee's Additional Training may be offered through personal consultation and/or through group seminars. Personal consultations will be scheduled at the request of Franchisee and may be conducted by telephone or in person. The frequency and scheduling of group seminars will be determined at the sole discretion of Coverall. Additional Training shall be attended as provided in Paragraph 9A. The cost and method of payment for Additional Training shall be as provided in Paragraph 7F.

    (3)   Retraining of Franchisee. If (i) within a sixty (60) day period any two customers being serviced by the Franchisee complain to Coverall about Franchisee's faulty workmanship, lack of trustworthiness, or any other claimed default by Franchisee, or (ii) if at any time any customer being serviced by the Franchisee cancels Franchisee's services for faulty workmanship, lack of trustworthiness, or other default under that customer's account contract, or (iii) if, pursuant to Paragraph 10C of this Agreement, Coverall discontinues Franchisee's services to a customer, Coverall may, in any of these events, require retraining of Franchisee. In the event of retraining, the time within which to offer or provide any remaining Initial Business and/or Additional Dollar Volume will be suspended from the time Franchisee is requested to attend retraining until Franchisee completes retraining to Coverall's satisfaction. Retraining is Additional Training, and the Franchisee will be charged an Additional Training fee, in accordance with the provisions of Paragraph 7F.

    B.   Promotional and Sales Materials. Coverall shall make available to Franchisee, at Franchisee's expense, promotional or sales materials for use in developing Franchisee's business.

    C.   Billing, Collection, and Records. Coverall has the exclusive right to perform all billing for services and supplies provided by Franchisee. All customer payments made to Coverall and all credits due Franchisee shall be applied, in whole or in part, to Franchisee's then due or past due obligations under this Agreement and all other agreements, present and future, between Coverall and Franchisee. At the beginning of each month, Coverall shall invoice and collect payment from the customers for all services and supplies provided by Franchisee. On the last day of the month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month in which the services and supplies were provided by Franchisee, Coverall will pay Franchisee amounts collected from customers, excluding amounts retained by Coverall on Strategic Accounts, less amounts due Coverall for the fees described in Paragraphs 7 and 14, as well as note payments, transfer fees, equipment lease payments, advances, and any other amounts due Coverall or any third party lender through whom Franchisee has financed any purchase from Coverall.

    If the services performed by Franchisee on any Coverall customer account(s) are discontinued for any reason, unless the customer account(s) is guaranteed as provided in Paragraphs 4 and 5 above, Coverall shall have the right to apply the entire amount of any payment subsequently received by Coverall from the customer account(s) no longer serviced by Franchisee to the balance (principle and/or interest) of any amount owed by Franchisee to Coverall, including but not limited to, promissory note(s), line of credit or any other financing provided to Franchisee by Coverall. Coverall shall also have the right but not the obligation, to pay any amount remaining after applying the payment to Franchisee's obligations to Coverall, to any third party lender from whom Franchisee borrowed funds to finance any purchase from Coverall. Nothing contained in this Paragraph 6C, however, shall be construed to release the Franchisee from its obligations to Coverall for any amount remaining due after applying the funds received from the discontinued customer account(s).

    Coverall shall be entitled to recover from Franchisee all reasonable attorneys' fees, court costs, and expenses, and out-of-pocket costs which may be incurred by Coverall in enforcing payment by any customer accounts and/or payment by Franchisee and Franchisee's lenders, guarantors, or others. Coverall may, in its sole discretion, assign to Franchisee (in the form of a written assignment agreement) the right to enforce payment on any delinquent

© 2003 (r) Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 6 of 24

Initial _____ Initial _____

P.M. 5

Coverall – 19

B. Sales and Marketing Fee. A sales and marketing fee for additional dollar volume provided in accordance with Paragraph 5 shall be charged pursuant to this Paragraph 7B. The sales and marketing fee for each customer account or accounts shall be payable at the time an additional customer account or accounts are accepted by Franchisee. If the sales and marketing fees exceed $150.00, Coverall may agree to finance Franchisee's purchase(s) of additional dollar volume. The amount financed by Coverall shall be payable in equal monthly installments of principal and interest at the rate of twelve percent (12%) per annum over the period of time agreed upon by Franchisee and Coverall, which period shall not exceed twenty-four (24) months, unless financing is provided, at Coverall's discretion, through the line of credit described in Paragraph 7G or by a third party lender. Payment will commence on the last day of the first month (if the last day of the month falls on a weekend and/or holiday, payment will be made on the next business day) following the month that Franchisee begins servicing the account related to the amount financed, unless the purchase is financed through a line of credit, in which event, repayment shall be in accordance with the provisions of Paragraph 7G, or pursuant to the terms and conditions of any third party financing. Franchisee may be required to execute a promissory note, in a form substantially similar to that attached as Exhibit B, reflecting the amount financed.

The sales and marketing fee shall be calculated as set forth in the Coverall Policy and Procedure Manual, as it may from time to time be modified or revised by Coverall.

C. Royalty. A royalty in an amount equal to five percent (5%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day of the month in which the services were performed. The sum total of the royalty and management fees may, at the discretion of Coverall, be subject to minimum payments of $50 per month in the first year of operation and $100 per month thereafter. The minimum fee may be adjusted for increases in the Consumer Price Index.

D. Management Fee. A management fee, as described in Paragraph 6E, hereof, in an amount equal to ten percent (10%) of the amount billed customers for any and all services and supplies provided by Franchisee, shall be payable monthly on the last day following the last day for the month in which the services were performed.

E. Special Services Finder's Fee. A fee shall be charged for special service contracts, for example, a one-time, non-recurring contract for services such as carpet cleaning, strip and waxing, or initial cleaning. The amount of the fee shall be twenty percent (20%) of the total special services contract price, unless Franchisee sells the job to the customer and furnishes all equipment, supplies and labor, in which case no fee will be charged. The total special services contract price equals the gross revenue from the contract to Franchisee before deduction of any other fee(s) payable to Coverall. Amounts billed customers for special services are subject to royalty and management fees.

F. Additional Training Fee. A fee shall be charged for Additional Training, as that term is defined in Paragraphs 6A (2) and (3). The Additional Training fee for each Additional Training course attended by Franchisee, and/or by Franchisee's employees, shall be Fifty ($50.00) Dollars. Coverall reserves the right to change the fee for any Additional Training course by setting forth the changed fee in the Coverall Policy and Procedure Manual as it may, from time to time, be amended. The Additional Training fee shall be due at the time of the Additional Training; however, Coverall may, in its sole discretion, upon the request of Franchisee, finance this Additional Training fee so that it is payable in up to twelve (12) equal monthly installments of principal and interest (which interest shall be at the rate of twelve (12%) percent per annum). If Coverall agrees to finance this Additional Training fee, Franchisee shall, prior to the Additional Training, sign a promissory note payable to Coverall, in the amount of the Additional Training fee. Notwithstanding the above, Additional Training fees totaling less than One Hundred Fifty ($150.00) Dollars in the aggregate will not be financed, and will be due at the time of the Additional Training.

G. Alternative Financing. Coverall reserves the right to extend, or make available to Franchisee alternative forms of financing, including the following:

1.) Line of Credit. The term "line of credit" shall mean a monetary amount which Coverall shall make available to Franchisee, and upon which Franchisee may draw, on a continuing basis, up to the maximum limit of the line of credit, for payment of a portion of Franchisee's Initial Franchise Fee, the purchase of Additional Dollar Volume (as defined in Paragraph 5A) and/or toward payment of any other item for which Coverall agrees to provide Franchisee financing. The initial limit of the line of credit shall be determined by Coverall, and Coverall may

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 8 of 24

A.    Initial Business. If Coverall does not (i) offer Franchisee, as provided in Paragraph 4A(i), all or any portion of the monthly dollar volume of Initial Business; or (ii) offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, as provided in Paragraph 4A(ii), a volume of Initial Business equal to that refused by Franchisee upon its initial, timely offer, provided Franchisee has not unreasonably rejected the post Initial Offering Period offer; or (iii) offer to replace guaranteed monthly dollar volume as provided in Paragraph 4B; then and in any event Franchisee will, upon Franchisee's request, be entitled to payment of an amount determined and payable as follows:

(1)    Determination of Amount Payable. The monthly dollar volume of Initial Business (i) not timely offered by Coverall to Franchisee under Paragraph 4A(i); or, (ii) not unreasonably refused by Franchisee under Paragraph 4A(ii); or (iii) not replaced by Coverall under Paragraph 4B, as the case may be, shall (a) be multiplied by two and eight-tenths (2.8) - the resultant figure shall be referred to as "the Gross Recalculated Amount;" (b) The current replacement cost of Franchisee's starter kit shall be subtracted from the Gross Recalculated Amount - the resultant figure shall be the "Amount Payable to Franchisee."

(2)    Payment of Amount Payable to Franchisee. If, at the time of the determination of the Amount Payable to the Franchisee, the Franchisee is indebted to Coverall, Franchisee's indebtedness shall be reduced by the Amount Payable to the Franchisee before the balance (if any) is paid to the Franchisee in cash or kind.

B.    Additional Dollar Volume. If Coverall is unable to provide or replace all or any portion of Franchisee's Additional Dollar Volume within a reasonable period of time, Franchisee's sole remedy shall be a refund of whatever sales and marketing fee was actually paid by Franchisee. If, at the time of this refund, the Franchisee is indebted to Coverall, this refund shall be applied to Franchisee's indebtedness, before the balance (if any) is paid to the Franchisee in cash or in kind.

C.    Sole Remedy. Franchisee acknowledges and agrees that the payment by Coverall to Franchisee of the Amount Payable to Franchisee, as provided in Paragraph 8A, shall be Franchisee's sole remedy in the event of Coverall's (i) failure to timely offer Initial Business; or (ii) failure to offer Franchisee, within a reasonable time after the expiration of the Initial Offering Period, a volume of Initial Business equal to that initially refused by Franchisee upon timely offer; or (iii) failure to replace guaranteed Initial Business. Franchisee further acknowledges and agrees that the refund to Franchisee, as provided in Paragraph 8B, shall be Franchisee's sole remedy in the event Coverall is unable to provide or replace any portion of Franchisee's Additional Dollar Volume. Franchisee agrees that this payment or refund is necessary as it would otherwise be difficult, if not impossible, to ascertain the damages incurred by Franchisee in the event of any failure by Coverall to timely offer or replace Initial Business, or to timely provide or replace Additional Dollar Volume. The parties agree that such payment or refund is not a penalty, but is a payment which Coverall must provide as liquidated damages as a consequence of Coverall's failure to offer or replace Initial Business, or to provide or replace Additional Dollar Volume. Upon Coverall's paying Franchisee, as provided in Paragraph 8A or 8B above as the case may be, Coverall shall be released from any obligation to offer or replace Initial Business, or to provide or replace Additional Dollar Volume, or to pay Franchisee any other damages.

9.    FRANCHISEE BUSINESS OPERATIONS.

A.    Franchisee To Attend Training Course. Franchisee shall attend the Initial Training as defined and described in Paragraph 6A(1), which is provided by Coverall to all new franchisees, and any other training courses Coverall may prescribe with respect to the needs of Franchisee or a particular customer serviced by Franchisee. The person signing this Agreement on behalf of Franchisee shall attend the Initial Training unless Coverall, in its sole discretion, agrees in writing to allow a designee of Franchisee to attend the Initial Training instead of the person signing this Agreement. Seminars shall be attended as provided in Paragraph 6A(1), although Franchisee's employees may also attend training. While there shall be no additional charge for the Initial Training, Franchisee shall be charged a fee for retaking Initial Training courses, including any retraining required under Paragraph 6A (3). The fee for the retaking of Initial Training courses and the manner of payment shall be as provided in Paragraph 7F.

B.    Franchisee to Abide by Policies and Procedures. Franchisee understands and acknowledges that every detail of the System is essential to Coverall, Franchisee, and other System franchisees in order to (i) develop and maintain quality operating standards, (ii) increase the demand for the services sold by all franchisees operating

© 2003 (r) Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 10 of 24

Initial    Initial

Coverall – 2

Coverall Marks. Franchisee thus acknowledges that the requirements of this Paragraph are necessary to assure continuing public acceptance and patronage of the Coverall System.

      A.    Franchisee to Contact Customer Accounts. Customer Accounts are delegated to the Franchisee to service. In order for Coverall and the Franchisee to keep the customer accounts, Franchisee must provide satisfactory service. Communication between the Franchisee and the customer account is important for understanding the needs of the customer account and knowing whether or not the service being performed by the Franchisee is satisfactory. Therefore, it is important for the Franchisee to develop a strong relationship with the contact person at the customer accounts. To facilitate customer account retention, Franchisee shall contact each customer account serviced by Franchisee, which has regular monthly service revenues of $500 or less. For each month commencing on the date that Franchisee begins servicing the customer account, Franchisee must contact the customer account either in person or by telephone and obtain a rating of Franchisee's performance. Franchisee must complete an Account Contact Report for each customer account contacted and submit them to Coverall no later than the 5th day of the month following the contact. Should Franchisee fail to submit the Account Contact Reports required by this Paragraph 10A for any two (2) consecutive months, Coverall may remove the Franchisee from the customer account for which the Account Contact Reports were not submitted. This obligation to inspect is continuing, and is unrelated to the inspections which Franchisee must perform in order to qualify for the customer account guarantee described in Paragraphs 4B and 5B.

      B.    Franchisee to Furnish Staff, Equipment, Materials, and Supplies. In consideration of the franchise fee paid by Franchisee, Coverall will provide, upon the opening of Franchisee's business, the equipment and supplies listed in Exhibit A of this Agreement. Thereafter, Franchisee will replace equipment and supplies as needed and will provide all staff, other equipment, materials, tools, and other supplies necessary to service customer accounts, including all janitorial services called for in each customer contract. In order to protect Coverall's Marks, all services will be performed in a good and workmanlike manner, satisfactorily to the customer account for which services are performed and in accordance with Coverall performance standards. Coverall may, at any time, inspect any premises serviced by Franchisee to assure that the quality of the services rendered is in accordance with Coverall standards. If Franchisee desires to cease servicing a customer account, Franchisee must give Coverall ten (10) days' written notice before ceasing service; in such event any remaining guarantee on the account shall be deemed to have been fulfilled, and Coverall shall have no obligation to replace the account.

      C.    Protection of the Goodwill of the System. Coverall, the Coverall System and Marks, and Coverall's Franchisees benefit from Coverall's goodwill, which arises out of Coverall's reputation in the market place. In order to protect Coverall and its Franchisees from the harm that arises from Franchisee activities that diminish Coverall's goodwill and Marks, Franchisee agrees that Coverall has the right to discontinue Franchisee's services to any customer upon the occurrence of any of the following:

      (1)    Franchisee fails to perform its obligations to the customer's satisfaction; or,

      (2)    The customer has made an oral or written complaint to Coverall; or,

      (3)    Coverall or the customer has given Franchisee written notice of Franchisee's failure to perform and five (5) days after delivery of the notice either the customer or Coverall is not satisfied that Franchisee has performed; or

      (4)    Franchisee receives three (3) written notices of failure to perform within a period of sixty (60) consecutive days, regardless of whether the Franchisee cured the deficiencies; or

      (5)    Coverall receives a request from a customer to terminate its contract; or,

      (6)    Coverall receives a request from a customer to replace the Franchisee; or

      (7)    Franchisee services any customer other than as a Franchisee of Coverall; or

      (8)    Franchisee fails to service a customer on any two (2) occasions within a period of sixty (60) days; or

© 2003 (r) Coverall North America, Inc.

Initial    Initial

A.M-S

Coverall – 2

specifications relating thereto and the means and manner of offering and selling same; and, all other components, specifications, standards, requirements and duties imposed by Coverall.

Franchisee shall not at any time copy, duplicate, record or otherwise reproduce any of the foregoing confidential information or material, in whole or in part, or otherwise make same available to any third party except as authorized herein. Upon the expiration or other termination of this Agreement, Franchisee shall return to Coverall all such confidential information including all materials, books, records, software and manuals deemed to be confidential which are in Franchisee's possession, custody, or control.

Franchisee and its employees who attend any or all of Coverall's initial training programs shall divulge only such confidential information as may be necessary, and then only to those full time and/or part time employees, agents, or independent contractors as must have access to it, in order to conduct the operation of the franchise business, and Franchisee shall take those precautions as shall be necessary to ensure that its employees retain the information in confidence.

If Franchisee is a proprietorship or partnership, Franchisee shall cause the proprietor or the partner, or other beneficial owner to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who subsequently assumes the status of proprietor, partner, or beneficial owner, within ten (10) days thereafter submit all executed Agreements to Coverall. If Franchisee is a corporation, Franchisee shall cause each officer, director, and shareholder to execute Coverall's current Confidentiality/Non-Competition Agreement within ten (10) days of the execution of this Agreement or, in the case of an individual who subsequently assumes the status of officer, director, or shareholder shall within ten (10) days thereafter submit all executed Agreements to Coverall. Franchisee, whether a sole proprietorship, partnership, or corporation, will cause each of its employees upon ten (10) days of the execution of this Agreement, or upon ten (10) days of hire of any employee, whichever last occurs, to execute a Coverall Confidentiality/Non-Competition Agreement.

13.    FRANCHISEE IS AN INDEPENDENT CONTRACTOR. Franchisee is and shall remain at all times a completely independent contractor in business for itself, and shall have no right or interest in or authority over Coverall or any of Coverall's property or business. Neither Franchisee, nor Franchisee's employees, are employees of Coverall. Neither Coverall nor Franchisee is the principal, agent, employer, employee, partner, officer, director, or owner of the other. Franchisee shall always hold itself out as an independent contractor in its dealings and communications with the public. Franchisee further agrees that it is not authorized to use the Marks or Substitute Marks in any capacity other than as provided in this Agreement, nor to sign on behalf of Coverall any checks, drafts, leases, bonds, mortgages, documents, bills, contracts, bills of sale or any other instruments in writing. Franchisee shall be free to conduct its business as it may deem best in providing services to the customer accounts, independently of the supervision, management, and control of Coverall, but Franchisee agrees to abide by all of the terms of this Agreement and all federal, state and local laws, OSHA requirements, and regulations of all government agencies having jurisdiction over the customer's premises or the activities conducted by Franchisee and all industry standards. Franchisee shall be responsible for all personal property, use, and other taxes assessed by governmental agencies. Franchisee shall be responsible for personal self-employment, income, and other taxes required to be withheld and hereby assumes full responsibility for payment of the employer's portion of any social security and other taxes required to be withheld for all of Franchisee's employees. Franchisee shall also pay and/or withhold taxes and premiums for unemployment and worker's compensation insurance for itself and all of its employees, as required by law. Franchisee shall provide Coverall, upon demand, proof of payment of all taxes due and compliance with all laws. Franchisee shall be responsible for all employment decisions and functions of its franchise business, including without limitation, those related to hiring, firing, training, wage and hour requirements, record keeping, supervision, and discipline of employees and order and sequence of work.

14.    INSURANCE. Franchisee shall be responsible for and shall indemnify and hold Coverall harmless for all losses, damages to property, or injuries to persons arising out of or connected with the performance or non-performance of Franchisee's business and services to customers, including any claimed damages for breach of security and claims or demands for damages resulting therefrom of whatever nature. Franchisee will obtain janitorial bonding in an amount not less than $100,000. Franchisee further agrees to maintain comprehensive liability insurance covering

© 2003 (r) Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 14 of 24

Initial    Initial

A.M.G
**Coverall – 2**

The plans are subject to change, modification, and/or cancellation. Future changes in premiums, coverages, etc. will be set forth in the Policy and Procedure Manual.

15.    INDEMNIFICATION. Franchisee shall be solely responsible for the services and results of services performed by Franchisee and its employees, and shall indemnify and hold harmless Coverall and its affiliates, and directors, officers and employees of each, and all other Coverall franchisees from all expenses, fines, suits, proceedings, claims, losses, damages, liabilities or actions of any kind or nature (including, but not limited to, costs and attorneys' fees) arising out of or in any way connected with Franchisee's operations. Franchisee further agrees that if Coverall is made a party to a lawsuit or other legal action in connection with the activities of Franchisee, then Coverall may tender the defense and/or prosecution of the case to the Franchisee who shall be responsible for diligently pursuing the case or action at Franchisee's expense, or Coverall may hire counsel directly to protect its interests and bill Franchisee for all costs and attorneys' fees incurred, and Franchisee shall promptly reimburse Coverall costs and expenses incurred. The obligations of Franchisee pursuant to this Paragraph shall survive the expiration or termination of this Agreement.

16.    ASSIGNMENT.

    A.    Coverall's Right to Assign the Franchise Agreement. Coverall may, without the consent of the Franchisee, assign this Agreement, or Coverall's rights and duties under this Agreement, to any other entity or third party, whether affiliated with or independent of Coverall. Coverall may also assign to any other entity or third party, whether affiliated with or independent of Coverall, any promissory note or other negotiable instrument of Franchisee which is payable to Coverall, either in conjunction with or independent of this Agreement. Coverall's rights under this Agreement shall inure to the benefit of any assignee or legal successor to Coverall. Specifically, and without limitation to the foregoing, Franchisee expressly affirms and agrees that Coverall may sell its assets, its Marks, or its System outright to a third party; may engage in a private placement or public offering; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments, and dispositions, Franchisee expressly and specifically waives any claims, demands, or damages arising from or related to the loss of the Marks and/or the loss of association with or identification with the Mark "Coverall" arising out of Coverall's exercise of any rights granted Coverall by this Paragraph 16A.

    B.    Franchisee's Right to Assign the Franchise Agreement.

        (1)    An assignment is defined as a voluntary or involuntary, direct or indirect, assignment, transfer, sale, gift, or other disposition by the Franchisee or any of its owners of any interest in this Agreement, the ownership of the Franchisee entity, or the franchise business, which assignment includes, without limitation: (i) assignment of ownership of stock or partnership interest; (ii) merger or consolidation or issuance of securities representing an ownership interest in the Franchisee entity; (iii) assignment in a divorce, insolvency, partnership, or corporate dissolution proceeding or otherwise by operation of law; and (iv) assignment in the event of death of the Franchisee or an owner of Franchisee, by will, declaration of or transfer in trust, or under the laws of intestate succession.

        (2)    Franchisee may, with the written consent of Coverall obtained after thirty (30) days prior written notice to Coverall, which consent will not be unreasonably withheld, assign this Agreement to a person ("the assignee") meeting the qualifications then established by Coverall for granting new franchises, provided: (i) Franchisee provides Coverall a copy of any written agreements relating to the proposed assignment or transfer, and any additional information which Coverall may require in order to determine whether it will grant its consent to the proposed assignment or transfer; (ii) the assignee enters into the franchise agreement then used by Coverall for granting new franchises; (iii) Coverall shall assess Franchisee a transfer fee of $1,500; (iv) Franchisee pays to Coverall all amounts due by Franchisee to Coverall; (v) Franchisee executes confidentiality and non-competition agreements in assignee's favor and in Coverall's favor with terms and conditions the same as the non-competition covenant in Paragraphs 12 and 19 of this Agreement; (vi) the assignee shall have the ability to immediately be in compliance with all laws, regulations and ordinances governing commercial janitorial cleaning; and (vii) Franchisee executes a general release, in a form satisfactory to Coverall, of any and all claims against Coverall and its affiliates and their officers, directors, employees, and agents; and (viii) the shareholders or partners of any corporate or partnership assignee

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 16 of 24

possession or control, even temporarily, of any trustee in bankruptcy or appointed receiver or the making of a general assignment for the benefit of creditors.

D.    Franchisee's attempt to assign this Agreement or the franchise business, or any right or obligation hereunder, without first securing Coverall's written consent, upon thirty (30) days' written notice to Coverall.

E.    Franchisee's voluntarily abandoning the franchise business.

F.    Franchisee's having been charged with a work-related crime or any other crime that substantially impairs the goodwill associated with the Marks and System.

G.    Franchisee's failure on two or more occasions to comply with one or more of the provisions of this Agreement or any other agreement between Coverall and Franchisee.

H.    Franchisee's breach of Paragraph 19 of this Agreement.

I.    Franchisee's engaging in conduct that reflects materially and adversely upon the operation and reputation of Coverall's or Franchisee's businesses or the Marks or the System.

J.    Franchisee's monthly revenues are below $150 for two consecutive months or for each of any three months in a six-month period.

K.    A material misrepresentation in Franchisee's application to become a franchisee.

L.    At any time more than: (i) nine (9) months after the death or incapacity of Franchisee, or the appointment of a conservator or guardian for the person or estate of Franchisee, if Franchisee is an individual; or (ii) nine (9) months after the death or incapacity of any of the general partners, or the appointment of a conservator or guardian for the person or estate of any of the general partners, if Franchisee is a partnership; provided, however, that this Agreement shall not terminate if within nine (9) months this Agreement or the general partner's interest is assigned in accordance with the provisions of Paragraph 16.

If the termination results from default as defined in subparagraphs A, D, H, or L of this Paragraph 17, termination may occur upon the expiration of ten (10) days following written notice of default, or as otherwise provided by law, if by then the Franchisee has failed to cure the default. If termination results from default as defined in subparagraphs B, C, E, F, G, I, J, or K, of this Paragraph 17, termination may occur immediately, without notice or opportunity to cure, unless otherwise provided by law.

18.    PROCEDURES AFTER TERMINATION.  Upon expiration, termination, or assignment of this Agreement for any reason, Franchisee shall cease to be a Coverall Franchisee and shall do all of the following acts and things, each of which shall survive the termination of this Agreement and shall remain an ongoing obligation of Franchisee:

A.    Immediately pay to Coverall all monies due to the date of termination, and cease doing business in accordance with the provisions of Paragraph 19. Any amounts due Coverall at or after Franchisee's termination may be offset against any amounts collected by Coverall on Franchisee's behalf.

B.    Immediately and permanently discontinue the use of all Coverall Marks, or any other name or designation indicating or tending to indicate that Franchisee is or ever was an authorized Coverall franchisee. Furthermore, Franchisee shall not promote or advertise the fact that Franchisee was formerly a franchisee or affiliate of the Coverall organization.

C.    Promptly surrender to Coverall all stationery, letterheads, forms, manuals, printed matter, films, books, cassettes, videotapes, and advertising containing Coverall Marks, including, but not limited to, the proprietary mark "Coverall," or any similar names or marks or designation indicating or tending to indicate that

© 2003 (r) Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 18 of 24

Initial    Initial

A. M. S

Coverall – 31

Statistical Areas in which Franchisee's Coverall Regional office conducts business, or within a 100-mile radius of that Coverall Regional office, whichever distance is greater. Franchisee will not, during the time period and in the geographic area covered by this Paragraph 19B, interfere or attempt to interfere with previously existing Coverall cleaning customers by diverting or attempting to divert from Coverall any cleaning accounts which were being serviced by Coverall franchisees or subcontractors during the year preceding the date on which Franchisee left the Coverall system.

        C.      Persons Bound By Covenants Not To Compete. Any person or entity having any legal or beneficial relationship to or interest in or traceable to, down, or through Franchisee is bound by the provisions of these covenants. Such persons shall include, but shall not be limited to, Franchisee's family members.

        D.      Court Modification of Agreement. The Franchisee agrees that this form of Agreement is prepared for use in many jurisdictions with differing public policies and that such public policies change. Accordingly, the Franchisee agrees that the prevailing non-competition restrictions set forth above may be modified by a Court to the extent necessary to make the non-competition agreements valid and enforceable against Franchisee.

        E.      Enforcement of Covenants Not to Compete. The covenants not to compete may be enforced by Coverall, its successors and assigns.

    20.    INFORMAL DISPUTE RESOLUTION.

        A.      Mediation. Except as is otherwise provided in Paragraph 20B, if a dispute arises out of or relates to this Agreement, or to the relationship of the parties, and if the dispute cannot be resolved or settled through negotiation, the parties agree that prior to the filing of any arbitration or other legal action consistent with the provisions of this Agreement, they will attempt, in good faith, to settle the dispute by non-binding mediation administered pursuant to the Commercial Mediation Rules of the American Arbitration Association, or as otherwise agreed upon by the parties. The mediation shall take place in the Area in which Franchisee conducts its business (as defined in Paragraph 3), and shall be administered by a neutral mediator agreed upon by the parties. In the event the parties are unable to agree upon a mediator within 15 days of the date on which either party requests mediation of a matter, the mediator shall be provided by the American Arbitration Association. The costs of the mediation shall be shared equally by the parties.

        B.      Notwithstanding anything to the contrary in Paragraph 20A, if Franchisee's Coverall Franchise Agreement has expired or been terminated, or if Franchisee has abandoned or failed to operate the Franchise for more than 30 days, Coverall shall not be required to avail itself of non-binding mediation in matters dealing with (i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promissory notes, equipment purchases, or lines of credit.

    21.    ADDITIONAL REMEDIES FOR BREACH.

        A.      Arbitration. Except as otherwise provided in Paragraphs 21A(14) and 21B, all controversies, disputes or claims between Coverall, its officers, directors, agents and/or employees (in their respective capacities) and Franchisee (and Franchisee's owners, officers, directors and/or any guarantors of this Agreement) arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall, including those set forth in the Coverall Policy and Procedure Manual, which controversies, disputes or claims are not resolved in accordance with Paragraph 20, shall be submitted promptly for arbitration.

        (1)    Arbitration shall be subject to the Federal Arbitration Act and, except as otherwise provided in this Agreement or agreed upon by the parties, the then current Rules of the American Arbitration Association for Commercial Arbitration.

© 2003 (r) Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 20 of 24

Initial    Initial

Coverall – 33

(i) the collection, by Coverall, of royalties or management fees claimed to be owing to Coverall by Franchisee; or (ii) the collection, by Coverall, of amounts claimed to be owing to Coverall by Franchisee under any promissory notes, equipment purchases, or lines of credit.

B.     Injunction and Specific Performance.     Notwithstanding anything in Paragraphs 20 and 21 to the contrary, Coverall shall be entitled to apply directly to a court of competent jurisdiction for the entry of preliminary and permanent injunctions and orders of specific performance enforcing the provisions of this Agreement or any other related agreement pertaining to Franchisee's use of the Marks; the obligations of Franchisee regarding confidentially or non-competition; any assignments or attempted assignments of this Agreement by Franchisee; any matter relating to the ownership of the Franchise, and/or any other matter for which Coverall would have no adequate remedy at law. If Coverall secures any injunction or order of specific performance, Franchisee agrees to pay Coverall an amount equal to the costs incurred by Coverall in obtaining relief, including, without limitation, attorney's fees, litigation costs and expenses, as well as any damages incurred by Coverall as a result of Franchisee's actions.

C.     Attorneys' Fees.     Should either Party incur attorney's fees in order to enforce the terms and conditions of this Agreement, including post-term covenants, whether or not an arbitration proceeding is instituted, the prevailing party shall be entitled to reimbursement by the other party of all litigation costs, including attorneys' fees.

D.     Survival.     The parties agree that the provisions of this Paragraph 21 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement.

22.     TIME TO ASSERT CLAIMS.     Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Coverall, or Franchisee's operation of its business, brought by any Party hereto against the other, shall be commenced within two years from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

23.     GOVERNING LAW.     This Agreement shall be interpreted and governed by the laws of the state in which the Franchise granted herein is located.

24.     ENTIRE AGREEMENT.     This is the full agreement of the parties. Any matter which is not actually written down and included in this document is not a term of this Agreement. To avoid any later misunderstanding about the exact terms of the Agreement, each Party affirms, by signing this Agreement, that it has not relied on any comment, promise, or representation not actually included in this Agreement. By signing this Agreement, the parties mutually agree that no evidence shall be admitted in any proceeding as to the existence of any term or promise claimed to be a part of the Agreement unless that term is explicitly stated within the Agreement. *DO NOT SIGN THIS AGREEMENT IF YOU ARE RELYING UPON ANY REPRESENTATION OR PROMISE NOT STATED IN THIS AGREEMENT.*

25.     AMENDMENT.     This Agreement may not be modified, altered, or amended except in writing executed by all of the Parties.

26.     WAIVERS.     Waiver by Coverall of any one or more defaults shall not operate as a waiver of successive or other defaults and all of Coverall's rights shall continue notwithstanding any such waiver or waivers.

27.     FORCE MAJEURE.     No party shall be liable for any loss or damage due to any delay in the performance of the terms (except for the payment of money) by reason of strikes, lockouts, and other labor troubles, fires, riots, wars, acts of terrorism, embargoes and civil commotion, or acts of God. Any such delay shall extend performance only so long as such event is in progress.

28.     SEVERABILITY.     If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

29.     NOTICES.     Any notices to be given by either Party to the other may be effected in writing either by

© 2003 (r) Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 22 of 24

Initial     Initial

A.M.G

Coverall – 35

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year written above (see Page 1 of this Agreement).

(If Franchisee is a partnership, this Agreement must be signed by each partner. If Franchisee is a corporation, this Agreement must be signed by a duly authorized officer.)

THIS AGREEMENT SHALL NOT BE VALID UNLESS SIGNED BY (i) FRANCHISEE; (ii) AN AUTHORIZED REPRESENTATIVE OF COVERALL'S REGIONAL OFFICE; AND (iii) A CORPORATE OFFICER AT COVERALL'S CORPORATE OFFICE. *AMINTON MARTINS DE SOUZA*

FRANCHISEE: _CARLOS JONES FURTADO_
(Print name of sole proprietor, partnership, or corporation.)

By: _Carlos alunes Furtado_      12-02-03
Date Signed

By: _Amilton M. de Souza_      12.02.03
Date Signed

By: _____      _____
Date Signed

COVERALL NORTH AMERICA, INC.

By: _Juan J. Hau_      10/2/03
Date Signed

Title: _Regional Director_

COVERALL OF BOSTON

ACCEPTED ON THIS _15th_ DAY OF _December_ , _2003_ .
(EFFECTIVE DATE OF AGREEMENT)

COVERALL NORTH AMERICA, INC.

By: _Jacqueline W. Vlaming_ , Vice President

© 2003 Coverall North America, Inc.

Exhibit A.1 to
Janitorial Franchise Offering Circular
Page 24 of 24

Initial    Initial

A·M·G

Coverall – 37

RECYCLED

## PROMISSORY NOTE

Coverall of BOSTON        FO# _8808_

_6500_                                  _Dec 02_     , _03_.

                                   _Amilton DeSouza_

     FOR VALUE RECEIVED, _Carlos Furtado_ ("Franchisee") agrees to pay to the order of Coverall North America, Inc. dba Coverall of _BOSTON_ ("Coverall"), in lawful money of the United States of America, the principal sum of _Sixty five Hundred_ Dollars (_6500_), with interest from the date above at the rate of twelve percent (12%) per annum on the unpaid balance of the principal sum until paid. Franchisee further promises to pay that principal sum and interest in installments as follows: Initial installment of _Three Hundred five + 98/100_ Dollars (_305.98_) on _Feb    28_, _04_ and _23_ successive monthly installments of _Three Hundred five + 98/100_ Dollars (_305.98_) each on the same day of each succeeding calendar month until all such payments have been made, on which date the entire balance of principal and interest unpaid shall be due and payable.

     This note may be prepaid without penalty.

     It is agreed that each installment, when paid, shall be credited first to interest then due and the remainder to principal. Should the interest not be paid, it shall, at the sole option of Coverall, become part of the principal and wil then bear the same interest as the principal.

     If a default be made in the payment of any installment of principal or interest when due, then the whole sum of principal and interest shall become immediately due and payable at the option of Coverall, with interest from the date of default at the rate of fifteen percent (15%) per annum until paid on the entire unpaid principal and interest.

     Franchisee agrees that the obligation evidenced by this Promissory Note shall, at Coveralls option, upon Coverall first giving Franchisee 30 days written notice, be converted from a Promissory Note to a revolving line of credit granted by Coverall to Franchisee. Under this line of credit Franchisee shall be obligated to pay to Coverall, on a monthly basis, the monthly amount currently payable; however, if the line of credit issued to Franchisee is, with Franchisee's consent, increased to an amount exceeding the principal balance of this note, Franchisee shall, in addition to the monthly amounts payable, be required to pay Coverall on a monthly basis, an amount equal to at least twelve and one half percent (12½%) of the amount by which Franchisee's gross monthly billings (regular service and special services) for each prior month exceeds the amount of gross monthly billings originally acquired by this note and other notes of Franchisee converted to the line of credit. In the event of a conversion to a line of credit exceeding the gross monthly billings originally acquired by this note and other notes of Franchisee converted to the line of credit, Coverall shall also have the right, upon first giving Franchisee 30 days written notice, to increase or decrease the rate of interest on said line of credit. Interest on the entire line of credit, including amounts which were payable under this note, shall be calculated on the outstanding daily balance of Franchisee's obligation to Coverall. In the event of such conversion, (i) the terms of default; and (ii) Coverall's right to accelerate the obligation hereunder in the event of default, shall remain the same. Franchisee shall, upon receipt from Coverall of written notice to so convert this obligation, execute any instruments and/or documents, as Coverall deems necessary. Failure by Franchisee to do so shall be considered an event of default. Details of the Coverall line of credit program, if and when adopted, shall appear in the Coverall Policy and Procedure Manual as it may, from time to time be updated and/or modified, or in a written policy directive detailing any modification or changes.

     Furthermore, this note and all other obligations, direct or contingent, of Franchisee or any endorser to Coverall, shall become fully due and payable immediately at the option of Coverall without demand or notice upon the happening of any of the following events:

          1. The failure of Franchisee to pay when due any installment of the principal and/or interest of this note.

©2003 Coverall North America, Inc.

Initial _CuF_
_A.M.S_

**Coverall - 41**

2. The failure of Franchisee to timely keep or properly perform any of the recitals, covenants, conditions, representations, warranties, obligations or guarantees contained in any agreement between Coverall and Franchisee.

3. The levy of any attachment, execution, or any other process against all or any part of the assets of Franchisee.

4. The failure of Franchisee to pay, withhold, collect or remit any tax or tax deficiency when assessed or due.

5. The suspension of the business of Franchisee, or the making of a general assignment for the benefit of creditors, or the commencement of proceedings for dissolution or liquidation, or the commencement of proceedings under any bankruptcy, insolvency, readjustment of debt or liquidation law or statute of the federal or state governments, or the adjudication as bankrupt or insolvent, or the involuntary appointment of a receiver, or applications therefor, or the making of a bulk sale or the giving notice of intention to do so.

6. The failure by Franchisee to execute, as above, any documents, which Coverall deems necessary to convert Franchisee's obligation to another form of financing.

7. At any time when, in the sole opinion of Coverall, Franchisee's financial responsibility becomes impaired or unsatisfactory.

Notwithstanding anything to the contrary in this Promissory Note or in any document previously executed by Franchisee and Coverall, in the event the services performed by Franchisee on any Coverall cleaning account(s) are discontinued in accordance with the provisions of Paragraph 10B of Franchisee's Coverall Franchise Agreement, Coverall shall have the right to apply toward the balance (principle and/or interest) of this Promissory Note, or toward any line of credit provided to Franchisee, as above set forth, the entire amount of any payment received by Coverall from the customer(s) of said account(s) at any time after the date of the discontinuation of services. The applying of any payment by Coverall shall be in addition to any payment required Franchisee under this note, or under any revolving credit payment adopted as above provided.

In the event an attorney is employed by Coverall to enforce any of these terms, Franchisee shall pay reasonable costs and attorneys fees and such amount shall be secured by this Promissory Note.

The obligation evidenced by this note is to be construed in accordance with the laws of the State or District in which the Franchisee conducts its Coverall business.

_Carlos Ulanos Partacle_

Name of Franchisee
(If a Corporation or Partnership)

Franchisee
(If Franchisee is Sole Proprietor)

By: _Hamilton M. de Souza_
Officer or Partner

By: _____
Officer or Partner

Shareholders/Partners/Guarantors of Franchisee
(If Franchisee is a Corporation or Partnership)

_____

_____

_____

©2003 Coverall North America, Inc.

Initial _CWF  OOF_
_A.M.S_
**Coverall - 42**



**GUARANTY TO COVERALL JANITORIAL FRANCHISE AGREEMENT**    FO# _808_

In consideration of, and as an inducement to Coverall North America, Inc. dba Coverall of _BOSTON_ ("Coverall"), entering into a Janitorial Franchise Agreement ("the Agreement") dated _Dec 2_, _03_, with _CARLos FURTADO_ _AMILTON DeSouza_ ("Franchisee"), the undersigned ("the Guarantor(s)") does hereby unconditionally guaranty, personally, the obligations of the Franchisee under the Agreement, as follows:

1. Guarantor(s) jointly, severally and unconditionally guaranties to Coverall performance of all responsibilities, duties, indebtedness and obligations of the Franchisee under the Agreement, including, but not limited to (a) payment of any fees due under the Agreement, including, but not limited to, initial fee, royalties, management fees, assignment fees, interest or late fees, training fees (if any) and fees for products, supplies or services furnished by Coverall to Franchisee; (b) obligations to hold harmless, defend and indemnify Coverall and related parties; and (c) any and all advances, debts, obligations, notes and liabilities of the Franchisee incurred in connection with or as a result of the Agreement, previously, now, or hereafter made, incurred, or created, voluntary or involuntary and, however arising.

2. Guarantor(s) authorizes Coverall, (whether or not after revocation or termination of this Guaranty without notice or demand (except as may be required by law) and without affecting or impairing Guarantor(s)' liability hereunder, from time to time, to (a) renew, compromise, extend, accelerate, or otherwise change the time for performance of, or otherwise change the terms of the obligation or any part thereof; and (b) release or substitute any one or more of the Guarantors, if there is more than one.

3. Any indebtedness of the Franchisee now or hereafter held by Guarantor(s) is hereby subordinated to the indebtedness of the Franchisee to Coverall, and all such indebtedness shall, if Coverall so requests, be collected, enforced, and received by Guarantor(s) as trustee(s) for Coverall, and be paid over to Coverall on account of the indebtedness of Franchisee to Coverall, without affecting or impairing in any manner the liability of Guarantor(s) under the other provisions of this Guaranty.

4. Guarantor(s) waives any right to require Coverall to (a) proceed against the Franchisee; (b) proceed against or exhaust any security held from the Franchisee; or (c) pursue any other remedy in Coverall's power whatsoever. Guarantor(s) waives any defense based on or arising out of any defense of the Franchisee other than payment in full of the indebtedness, including, but not limited to, any defense based on or arising out of the disability of the Franchisee, the unenforceability of the indebtedness or any part thereof from any cause, or the cessation from any cause of the liability of the Franchisee, other than payment in full of the indebtedness. Coverall may, at its election, foreclose on any security held by Coverall by one or more judicial sales, whether or not every aspect of any such sale is commercially reasonable, or exercise any other right or remedy Coverall may have against the Franchisee or any security, without affecting or impairing in any way the liability of Guarantor(s) under this Agreement, except to the extent the indebtedness has been paid. Guarantor(s) waives any defense arising out of such an election by Coverall, even if the election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of Guarantor(s) against the Franchisee or any security. Until all indebtedness of the Franchisee to Coverall is paid in full, even though that indebtedness is in excess of Guarantor's liability under this Agreement, Guarantor(s) shall: (a) have no right of subrogation; (b) waive any right to enforce any remedy that Coverall now has or may hereafter have against Franchisee; and (c) waive any benefit of, and any right to, participation in any security now or hereafter held by the Franchisee. Guarantor(s) waives all presentments, demands for performance, notices of protest, notices of dishonor, notices of acceptances of this Guaranty, and notices of the existence, creation, or incurring of new or additional indebtedness. Guarantor(s) assumes all responsibility for keeping informed of the Franchisee's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the indebtedness and the nature, scope, and extent of the risks that Guarantor(s) assumes and incurs hereunder, and agrees that Coverall shall have no duty to advise Guarantor(s) of information known to it regarding those circumstances or risks.

5. Guarantor(s)' obligations hereunder are joint and several, and independent of those of the Franchisee, and a separate action or actions may be brought and prosecuted against the Guarantor(s) whether action is brought against the Franchisee and/or Guarantor(s), or whether the Franchisee and/or the Guarantor(s) be joined in any such action or actions; and the Guarantor(s) waives the benefit of any statute of limitations affecting the Guarantor(s)' liability hereunder, or the enforcement thereof.

6. In addition to the amounts guaranteed under this Agreement, Guarantor(s) jointly and severally agrees to pay reasonable attorneys' fees and all other costs and expenses incurred by Coverall in enforcing this Guaranty in any action or proceeding, arising out of, or relating to, this Guaranty.

7. It is not necessary for Coverall to inquire into the powers of the Franchisee or the officers, directors, or agents acting or purporting to act on their behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

8. If any provision of this Guaranty contravenes or is held invalid under the laws of any jurisdiction, this Guaranty shall be construed as though it did not contain that provision, and the rights and liabilities of the parties of this Agreement shall be construed and enforced accordingly.

9. In addition to the above provisions, Guarantor(s) agrees to comply with all provisions and covenants in the Agreement related to the protection of the Coverall trade and service marks and the Coverall confidentiality and trade secrets (both in-term and post term). In addition the Guarantor(s) agrees to be bound by all Non-Competition covenants of the Agreement, both in-term and post-term, which covenants shall be as fully binding and enforceable on Guarantor(s) as though they were set forth herein.

IN WITNESS WHEREOF, the undersigned Guarantor(s) has this _2_ day of _Dec_, _03_ executed this Guaranty in the City of _STONEHAM_, State of _MA_.

**"GUARANTOR(S)"**

| Signature | Print Name | Address |
|---|---|---|
| _Carlos eduard Furtad_ | _CARLOS NUNES FURTADO_ | _249 Chatham ST th Lynn MA 01902_ |
| _Amilton M. de Souza_ | _AMILTON MARTINS De SOUZA_ | _352 Chelsea st #2 e Boston MA 02128_ |
| | | |

Signature            Print Name            Address

Exhibit A.2 to
Janitorial Franchise Offering Circular

© 2003 Coverall North America, Inc.

**Coverall – 43**

## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

Attorneys at Law
18 Tremont Street, Suite 500
Boston, MA 02108

Warren H. Pyle
David B. Rome
Harold L. Lichten*
Betsy Ehrenberg
Shannon Liss-Riordan**
Terence E. Coles
Katharine D. Shea

M. Amy Carlin
Nicole Horberg Decter**
Rebecca G. Pontikes
Alfred Gordon
Leah M. Barrault

*Also admitted in Maine
**Also admitted in New York

Telephone (617) 367-7200
Fax (617) 367-4820

Tod A. Cochran
OF COUNSEL

September 14, 2005

**VIA MAIL AND FACSIMILE** (401) 435-6529
Wilma Rooney
Michaela E. Gaudette
Case Managers
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914

Re:    Coverall North America, Inc.

Dear Ms. Rooney and Ms. Gaudette:

Coverall North America, Inc. ("Coverall") has filed eight arbitration demands against individuals whom I represent; their names and the AAA case numbers are listed below. I am writing to notify you that I represent these individuals and that you should communicate with me, rather than directly with them, in connection with these cases.

These individuals dispute that there is a valid arbitration agreement between them and Coverall. A class action lawsuit against Coverall will be filed in court imminently, asserting that these workers should have been classified as employees of Coverall, rather than as independent contractors, along with other related claims.

I request that these arbitration cases be stayed pending a judicial determination regarding whether these claims may be heard in court or instead whether they must be arbitrated.

In the event that the AAA does not immediately stay these arbitration cases, and proceeds with the administrative conference calls for these cases that are scheduled to begin tomorrow, September 15, 2005, I request that one call be



## PYLE, ROME, LICHTEN, EHRENBERG & LISS-RIORDAN, P.C.

held, rather than eight separate calls. Michael Vhay represents Coverall in each of these matters, and I represent each of the respondents; accordingly, it would be much more efficient to hold one conference call rather than eight separate calls.

Please let me know if you have any questions, and whether these cases may be stayed and the administrative conference calls accordingly postponed.

Sincerely,

Shannon Liss-Riordan

cc:    Michael Vhay, Esq.

Cases:

Coverall North America, Inc. and Joao Padihla
Case No. 11-114-01899-05

Coverall North America, Inc. and Wanor de Carvalho
Case No. 11-114-E-01903-05

Coverall North America, Inc. and Sandra Lisboa and Miriam Carvalho
Case No. 11-114-01902-05

Coverall North America, Inc. and Amilton DeSouza and Carlos Furtado
Case No. 11-114-01907-05

Coverall North America, Inc. and Adelson Sodre
Case No. 11-114-E-01904-05

Coverall North America, Inc. and Luciana Canestrano
Case No. 11-114-01901-05

Coverall North America, Inc. and Napoleo Pereira
Case No. 11-114-E-01906-05

Coverall North America, Inc. and Marcos Martins
Case No. 11-114-01898-05

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)___Coverall North America, Inc. v. Carlos Furtado et al.___

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

☑ II.    195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
    740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

☐ III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
    315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
    380, 385, 450, 891.

☐ IV.    220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
    690, 810, 861-865, 870, 871, 875, 900.

☐ V.    150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
    YES ☐  NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
    YES ☐  NO ☑
If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
    YES ☐  NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
    YES ☐  NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
    YES ☑  NO ☐

A. If yes, in which division do all of the non-governmental parties reside?
    Eastern Division ☑    Central Division ☐    Western Division ☐

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
    Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
    YES ☐  NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME___Michael D. Vhay and Traci S. Feit, DLA Piper Rudnick Gray Cary US LLP___
ADDRESS___One International Place, 21st Floor, 100 Oliver Street, Boston, MA 02110-2600___
TELEPHONE NO.___617-406-6000___

(CategoryForm.wpd - 5/2/05)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Coverall North America, Inc.

## DEFENDANTS

Carlos Furtado and Amilton DeSouza

**(b)** County of Residence of First Listed Plaintiff — Boca Raton, Florida
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Michael D. Vhay and Traci S. Feit, DLA Piper Rudnick Gray Cary US LLP, One International Place, 21st Floor, Boston, MA 02110

Attorneys (If Known)

Shannon Liss-Riordan, Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., 18 Tremont Street, Suite 500, Boston, MA 02108

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) | |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | | Appeal to District |
|---|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
9 U.S.C. s. 4

Brief description of cause:
Petition to compel arbitration

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE
09/15/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____